**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MADONNA VOLLAND-GOLDEN**, as | ) | |
| executor of the estate of **JOHN VOLLAND**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13 C 1477 |
| | ) | |
| **CITY OF CHICAGO**, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This 42 U.S.C. § 1983 ("Section 1983") action was originally brought by John Volland ("Volland") to charge that two City of Chicago police officers (the "Officers") had violated his federal constitutional rights and some related Illinois law rights as well: in federal terms, claims of (1) unlawful search and seizure, (2) the federal equivalent of false arrest, (3) conspiracy and (4) excessive force, and in state law terms, malicious prosecution and battery.[1] Volland has also named the City of Chicago (the "City") as a defendant under theories of respondeat superior (as to asserted violations of state law) and indemnification (as to asserted violations of Section 1983).

Now before this Court for resolution are the parties' cross-motions in limine (and their respective responses to those motions) on the question whether Volland's testimony at an earlier

---

[1] Volland is now deceased, so that (as the caption reflects) the case is being carried on by his sister (and personal representative of his estate) Madonna Volland-Golden. This opinion will refer to Volland himself throughout as though he were still alive, except in those instances where it would be awkward to do so.

criminal trial is properly admissible in this civil action.[2]  For the reasons set out in this opinion, this Court finds Volland's prior testimony to be admissible under Fed. R. Evid. ("Rule") 804(b)(1).

## Factual Background

This case concerns a February 25, 2012 traffic stop gone wrong and its aftermath. Volland's and defendants' accounts of the facts diverge widely.

Volland asserts (1) that while he was driving on a side street near his home the Officers stopped him without any reasonable suspicion that he had violated any law or ordinance, (2) that after arguing with the Officers he said he was going to call their supervisor and (3) that the Officers prevented him from doing so by spraying him with pepper spray, dragging him from the car, beating him while he was handcuffed and then arresting him (see generally Volland Test. 95:20-122:12[3]).  Volland asserts that the Officers then filed false police reports to the effect that Volland had accosted them, which in turn caused the State of Illinois and the City to bring false charges against him (see Compl. ¶¶ 56-66).

Although defendants do not present their side of the story in as much detail (nor are they required to at this stage of the litigation), it appears to be their contention (1) that the Officers stopped Volland because he was driving on the wrong side of the street, (2) that he was hostile when the Officers approached his car, refusing to produce his driver's license, (3) that he reached

---

[2]   This opinion identifies Volland's and defendants' submissions as "V." and "D." respectively, followed by appropriate designations:  each initial motion (Dkt. 83 by Volland, Dkt. 84 by defendants) as "Motion" and Volland's Response to defendants' Motion (Dkt. 88) as "Resp."

[3]   All citations to prior testimony in this opinion refer to the page and line numbers of John Volland's criminal trial transcript.  That trial took place on Jan. 28, 2013 in the Circuit Court of Cook County, Ill., First Mun. Dist. No. 12-189278.

out of his car window to push one of the Officers and (4) that the Officers then executed an arrest of Volland, which required the use of pepper spray and a takedown maneuver due to his physical resistance to their attempts to remove him from the car and handcuff him (see generally Sautkus Test. 21:3-26:23). Clearly, given that account of the facts, the Officers also assert that their police report was not falsified.

What happened next is not in material dispute. On January 28, 2013 the City dismissed its charges that Volland had committed a traffic violation and disobeyed a police officer (Amended Answer ("AA") ¶ 38). Also on that date, Volland stood trial before a jury on the state charges of resisting a peace officer and simple battery (id. ¶¶ 34, 39). Volland testified at length about his version of events (summarized above), and a Cook County Assistant State's Attorney ("ASA") cross-examined him, asking about 80 distinct questions (see Volland Test. 122:16-141:13). Only three witnesses -- Volland and the two officers -- testified at the trial, so that the jury was called upon to decide whom to believe. Volland was acquitted on all charges (AA ¶ 39).

On February 25, 2013 Volland filed this lawsuit. On May 31, 2014 he died of natural causes at his home (V. Motion To Substitute Parties ¶ 2 (Dkt. 73)). Volland's sister, as executor of his estate, has continued this litigation in his stead.

It is because of Volland's death that the admissibility of his testimony at the criminal trial has become a pressing concern. Volland's estate has understandably moved to admit his testimony in the 2013 criminal trial as evidence in the trial of this action. Defendants counter that Volland's testimony at the criminal trial is hearsay not falling within an exception.

# Rule 804(b)(1)

More specifically, Volland and defendants lock horns over the admissibility of Volland's prior testimony under Rule 804(b)(1). Rule 804 provides numerous exceptions to Rule 802's bar of hearsay evidence, with the one pertinent here (Rule 804(b)(1)) reading:

> (b) **The Exceptions.** The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:
>
> > (1) **Former Testimony.** Testimony that:
> >
> > > (A) was given as a witness at a trial, hearing, or lawful deposition, whether given during the current proceeding or a different one; and
> > >
> > > (B) is now offered against a party who had -- or, in a civil case, whose predecessor in interest had -- an opportunity and similar motive to develop it by direct, cross-, or redirect examination.

No one disputes that Volland is unavailable to testify, that his prior testimony was given at one of the enumerated proceedings (a criminal trial) or that the State had a full opportunity to cross-examine him during that proceeding. Instead the parties cross swords over two matters: whether the State can properly be considered a predecessor in interest to defendants (and especially to the Officers) and whether the State had a similar motive to develop Volland's testimony by cross-examination. This opinion will address the more uncertain predecessor-in-interest question before turning to the similarity of the motives of defendants and the State.

No definition of "predecessor in interest" is provided in the Rules. If the term were to be viewed through the lens of garden-variety English speech, it would almost tautologically be broad enough to cover the State's relationship to defendants. Like the more generic dictionaries, Black's Law Dictionary 1216 (8th ed. 2004) straightforwardly defines a "predecessor" as "[o]ne

who precedes another in an office or position."  And the primary definition of "interest" in Black's, id. at 828 is "[t]he object of any human desire."  So a "predecessor in interest," in its most literal sense, is simply one who precedes another in desiring a particular object.  And here the State clearly meets that definition in relation to defendants.  It preceded them as the party opposing Volland, and it desired the same object that defendants now desire:  to discredit Volland's version of events with an eye toward demonstrating that the Officers' version of the same events is more reliable.

But the term's inclusion in Rule 804(b)(1)(B) calls for a more searching analysis of the history and interpretation of the term, which arrives at the same destination -- it too reveals that the State qualifies as a predecessor in interest to defendants.  It is to that analysis this opinion now turns.

"Predecessor in interest" appeared nowhere in the initial draft of Rule 804 that the Supreme Court submitted to Congress, but the House Judiciary Committee inserted it for this stated reason (Rule 804, Notes of Committee on the Judiciary, H.R. Rep. No. 93-650, reprinted in 1974 U.S.C.C.A.N. 7075, 7088):

> The Committee considered that it is generally unfair to impose upon the party against whom the hearsay evidence is being offered responsibility for the manner in which the witness was previously handled by another party.

At first blush that might perhaps be read as calling for a "predecessor in interest" to be in more or less strict privity with the party against whom evidence is being offered.  But the Senate Judiciary Committee did not think that adding the term "predecessor in interest" imposed such a drastic limitation on the use of prior testimony (Rule 804, Notes of Committee on the Judiciary, S. Rep. No. 93-1277, reprinted in 1974 U.S.C.C.A.N. 7051, 7054):

> The House amended the rule to apply only to a party's predecessor in interest. Although the committee recognizes considerable merit to the rule submitted by the Supreme Court, a position which has been advocated by many scholars and judges, we have concluded that the difference between the two versions is not great and we accept the House amendment.

In accord with the Senate's gloss, every federal Court of Appeals to address the issue head-on has determined that the term "predecessor in interest" does not invoke the common law concept of privity but rather sets out a more forgiving standard (see, e.g., Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 128 (4th Cir. 1995); Clay v. Johns-Manville Sales Corp., 722 F.2d 1289, 1294-95 (6th Cir. 1983); Lloyd v. Am. Export Lines, Inc., 580 F.2d 1179, 1185–87 (3d Cir.1978) and other authorities cited in those cases).

Although that makes clear what "predecessor in interest" does not signify, it is somewhat less clear what the term does signify. Our own Court of Appeals has taken up its meaning only once, in a now 30-year-old case. (United States v. Feldman, 761 F.2d 380 (7th Cir. 1985)) that spent just two sentences disposing of the predecessor-in-interest question. In holding that a bankruptcy trustee's presence at the earlier deposition did not render the since-deceased deponent's testimony admissible in a later criminal proceeding, Feldman, id. at 387 said:

> In any event, the Trustee's questions cannot be deemed to have the same measure of scrutiny or the same focus as questions that would have come from a criminal defendant. In short, no one at the . . . deposition had the requisite stake in the proceeding that would be necessary for them to be deemed a predecessor in interest to the criminal defendants, and those who did have the requisite stake had no reason to suspect that they should be there.

Thus Feldman tied the predecessor-in-interest inquiry to the notion of "stake,"[4] an apparent reference to the party's personal interest in the outcome of the case. But it must be kept

_____

[4] It is true that the test drawn by other Courts of Appeals from Feldman's treatment is not one of "stake" but rather one of "similarity of motive" (see United States v. Jackson-Randolph,

(continued)

in mind that "predecessor in interest" does not mean anything so strict as "privity," so that the question must be whether the two parties had roughly commensurate stakes in the outcome of their respective proceedings and not, as defendants would have it (see D. Motion at 3), whether the two parties had _exactly_ _the_ _same_ _interest_ in the respective outcomes of the two proceedings -- for that would function as the kind of "formalistically grudging" privity requirement that the Courts of Appeals have uniformly rejected (see, e.g., Lloyd, 580 F.2d at 1187).

Here the State's stake in Volland's criminal trial was entirely commensurate to defendants' current stake in this action. It should go without saying that state and local governments take very seriously indeed any alleged assaults on their police officers, and defendants never credibly argue that there were particular facts that made the State's interest in prosecuting Volland less than would be typical. Furthermore, defendants here have a lesser stake in this action (i.e., the potential for damages liability) than did the defendants in Feldman, who had already been sentenced to 12 years in prison when our Court of Appeals heard the case. Hence although the State's interest in securing a conviction of Volland and defendants' present interest in avoiding damages liability are different in kind, neither interest is clearly weightier than the other. And so when the State put Volland on trial and cross-examined him it had "the

---

(footnote continued)
282 F.3d 369, 381-82 (6th Cir. 2002); United States v. McDonald, 837 F.2d 1287, 1292 (5th Cir. 1988)). But our own Court of Appeals has never read Feldman to create a "similarity of motive" test as to the predecessor-in-interest question. Indeed, it would make little sense to do so, given that "predecessor in interest" and "similar motive" are separate terms in Rule 804(b)(1) and that nothing in the language of the Rule suggests a one-to-one equivalence between them. Despite Feldman's treatment of "stake" as a concept relevant to both the motive inquiry and the predecessor-in-interest inquiry, it nevertheless seems the better part of prudence to preserve some sort of analytical distinction between the two terms.

requisite stake in the proceeding" (<u>Feldman</u>, 761 F.2d at 387) so as to be held a predecessor in interest of defendants for the purposes of Rule 804(b)(1).

With the predecessor-in-interest issue thus squared away, this opinion turns to the question whether the State had a "similar motive" to develop Volland's testimony through cross-examination. Justice Blackmun's concurring opinion in <u>United States v. Salerno</u>, 505 U.S. 317, 326 (1992) (emphasis in original) has provided an overview of the similar-motive inquiry:

> Because "similar motive" does not mean "identical motive," the similar-motive inquiry, in my view, is inherently a <u>factual</u> inquiry, depending in part on the similarity of the underlying issues and on the context. . . . Moreover, like other inquiries involving the admission of evidence, the similar-motive inquiry appropriately reflects narrow concerns of ensuring the reliability of evidence admitted at trial -- not broad policy concerns. . . .

As for the specifics of that inquiry, once again <u>Feldman</u> is the leading case for this Court's analysis, listing as it does four factors worth considering in determining whether parties had a "similar motive" to develop testimony (761 F.2d at 385):

> (1) the type of proceeding in which the testimony is given, (2) trial strategy, (3) the potential penalties or financial stakes, and (4) the number of issues and parties.

While it is not essential to examine every one of those factors (<u>Feldman</u> itself weighed only two of them), in this instance <u>all</u> <u>four</u> <u>of</u> <u>them</u> weigh in favor of admitting Volland's trial testimony. Because the "potential penalties or financial stakes" factor has just been addressed as part of the predecessor-in-interest analysis (and has been found to weigh in favor of admission), only the other three factors call for review.

First, the type of proceeding certainly weighs in favor of admitting Volland's testimony. <u>United States v. DiNapoli</u>, 8 F.3d 909, 912-13 (2d Cir. 1993) noted that similarity in the type of

proceedings will typically support a conclusion that there was a similar motive to develop testimony. As <u>DiNapoli</u>, <u>id.</u> at 912 stated:

> Where both proceedings are trials and the same matter is seriously disputed at both trials, it will normally be the case that the side opposing the version of a witness at the first trial had a motive to develop that witness's testimony similar to the motive at the second trial.

That observation carries all the more force here, because Volland testified in a <u>criminal</u> proceeding, where the State had the burden of proof and could succeed only by proving its case beyond a reasonable doubt. Hence the State had the utmost incentive to call into question Volland's version of events, which (as set forth in the earlier factual summary) flatly contradicted the version told by the Officers on nearly every material point.

By contrast, this is a civil action governed by a preponderance-of-the-evidence standard, and Volland -- not defendants -- has the burden of proof. That means defendants would actually have a somewhat weaker incentive than did the State, all other things being equal, to discredit Volland -- they could succeed simply by showing that their version of events is no less believable, or just slightly more believable, than Volland's. Hence the types of the two proceedings at issue here also weigh substantially in favor of finding that the State had a motive to develop (and to discredit) Volland's testimony that was similar to the motive defendants now have.

As for trial strategy, that second factor also weighs in favor of admissibility. Based on the State's cross-examination of Volland it appears that the State's strategy was twofold: first, to show that Volland had reacted to the officers much more angrily and with more resistance than his direct testimony suggested, and second, to re-emphasize Volland's timeline of events (to assist in a later demonstration of its implausibilities), such as Volland's statement that the police

asked him for identification after pepper spraying, beating and handcuffing him (see Volland

Test. 141:2-141:3).  Some of the State's questions also seemed aimed at drawing out Volland's

temper, perhaps to show the jury that he had a short fuse (and indeed the ASA succeeded -- if

that is the word -- in getting Volland to curse at him (see id. at 138:16-138:17)).

     While the criminal trial was no episode of Law and Order, the State's cross-examination

reflected not just a strategy aimed specifically at discrediting Volland's story that he had been

accosted for no reason by the Officers, but also demonstrated some thoughtfulness, preparation

and skill.  Especially in light of the fact that defendants have not suggested any line of

questioning that the State could have pursued but did not, while defendants could have done so

fruitfully (see Battle ex rel. Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 553 (5th Cir.

2000)), there is nothing about the State's trial strategy that suggests it had a motive to develop

Volland's testimony that was materially different from defendants' -- and indeed the opposite

seems true.

     That leaves one final factor to consider, the number and type of issues and parties, and it

is that factor that most clearly shows how similar the State's motive was to defendants' -- indeed

the motives were practically identical.  On that score defendants attempt to make much of the

difference between the charges the State leveled against Volland (resisting a peace officer and

battery) and the theories of relief Volland now advances in support of his claim against

defendants (violations of the Fourth Amendment and conspiracy to commit such violations, as

well as state law torts of battery and malicious prosecution), urging that each of those infractions

involves a different set of elements that must be proved separately.  As defendants would have it,

the State had to show one set of facts (that Volland resisted and battered the Officers), while

defendants now have to advance a different set of facts (that the Officers did not use

unreasonable force or stop Volland without reasonable suspicion, for example). And that, say defendants, destroys any similarity of motive to develop Volland's testimony.

While such an oversimplistic dichotomy might arguably be employed to weigh against the admission of Volland's trial testimony (see <u>Oberlin v. Marlin Am. Corp.</u>, 596 F.2d 1322, 1329 (7th Cir. 1979)), defendants' portrayal is totally inaccurate. In fact, precisely the same factual issues were in material dispute during the criminal trial as are now in dispute in this civil action -- just compare, for example, a single one of the offenses leveled against Volland (resisting arrest) with one of the theories that Volland now puts forward (unreasonable use of force in violation of the Fourth Amendment) to see why that is so.

As for unreasonable force, a party asserting that theory in the context of an arrest (as Volland does) must show that "the officer use[d] greater force than was reasonably necessary to effectuate the arrest" (<u>Phillips v. Cmty. Ins. Corp.</u>, 678 F.3d 513, 519 (7th Cir. 2012)). Central to that inquiry is whether the asserted victim of unreasonable force actively resisted arrest (<u>id.</u> at 524). Clearly Volland's asserted theory of unreasonable force in violation of the Fourth Amendment puts at issue both Volland's <u>and</u> the Officers' actions during the police stop and arrest. In that regard defendants must address the actions of both the Officers <u>and</u> Volland -- not, as defendants would have it, those of the Officers alone -- if they are to defeat Volland's claim for relief under that theory.

Look for example at one of the charges on which Volland was acquitted, resisting a peace officer, which Illinois law defines in these terms (720 ILCS 5/31-1(a)):

> A person who knowingly resists or obstructs the performance by one known to
> the person to be a peace officer, firefighter, or correctional institution employee of
> any authorized act within his or her official capacity commits a Class A
> misdemeanor.

At Volland's criminal trial the State had to prove not just that Volland had resisted or obstructed the Officers but also that the Officers were engaged in an "authorized act" when he did so. While Illinois law treats all arrests as authorized acts even when they lack probable cause (see People v. Locken, 59 Ill. 2d 459, 464-65, 322 N.E.2d 51, 54 (1974)), an officer's use of excessive force in conducting an arrest effectively turns the arrest into an unauthorized act and brings into play the arrestee's right to resist the officers physically in self-defense (see People v. Wicks, 355 Ill. App. 3d 760, 763-64, 823 N.E.2d 1153, 1156 (3d Dist. 2005)). Once again, what all of that makes clear is that to convict Volland on the charge of resisting a peace officer the State had to address not just his actions but also the question whether the Officers used excessive force.[5]

In short, both Volland's criminal trial and this civil action turn on the resolution of identical factual questions: what physical force (if any) Volland used against the Officers, what physical force the Officers used against Volland, whether the latter force was reasonable under the circumstances and finally the order in which events unfolded.[6] So rather than the analysis

---

[5] It also seems likely that the State had to show that the Officers' initial stop of Volland was supported by reasonable suspicion. There is uncertainty in the Illinois courts as to whether a citizen is free to disobey or resist an officer's order to stop when the officer lacks reasonable suspicion for conducting a Terry stop (see People v. Swiercz, 104 Ill. App. 3d 733, 736-37, 432 N.E.2d 900, 902 (1st Dist. 1982), holding that Locken applies only to unlawful arrests, so that citizens are free to resist police officers when they engage in other unauthorized acts; see also People v. Ortiz, 16 Ill. App. 3d 13, 15-16, 305 N.E.2d 205, 206-07 (1st Dist. 1973), a pre-Locken case holding that there can be no violation of 720 ILCS 5/31-1(a) for refusing an officer's order to stop where the officer lacked reasonable suspicion for giving the order; but contrast the opinion in City of Champaign v. Torres, 346 Ill. App. 3d 214, 218, 803 N.E.2d 971, 974 (4th Dist. 2004) aff'd on other grounds, 214 Ill. 2d 234, 824 N.E.2d 624 (2005), reading Locken more broadly). But even were reasonable suspicion and the Officers' initial stop of Volland not at issue in the criminal trial, the Feldman factors would still weigh heavily in favor of admitting Volland's testimony on that subject.

[6] To give just one example, the jury's answer to the question whether Volland pushed the Officers (if he did so at all) before or after they pepper sprayed him could have been the

(continued)

- 12 -

pointing up any difference in the motives that the State had and defendants now have to develop Volland's testimony, this Court's scrutiny of the issues reveals that the State's cross-examination of Volland had objectives essentially identical to those in any examination that defendants hypothetically could conduct now if Volland were still alive. All of that weighs heavily in favor of finding a similar motive for the purposes of Rule 804(b)(1).

In sum, there can be no doubt that Volland's testimony at his criminal trial is admissible in this action under Rule 804(b)(1). That is true from every perspective -- whether from the Feldman factors in isolation, or from an examination of the State's status as predecessor in interest, or from a view of the whole picture in practical terms as urged both by Justice Blackmun's concurrence in Salerno, 505 U.S. at 326 and by Courts of Appeals (see, e.g., Lloyd, 580 F.2d at 1187; accord, Clay, 722 F.2d at 1295). Both this action and the criminal trial involve the same incident, and both the State's and defendants' success hinged or hinges on the ability to discredit Volland's account of what happened -- globally as well as in every minute detail. That is more than enough for admissibility under Rule 804(b)(1).

## **Rule 807**

Before concluding, this opinion pauses briefly to address the residual exception to the rule against hearsay -- that is, Rule 807 -- which is lingering in the background (if nothing else) in this dispute. That Rule reads in relevant part:

_____

(footnote continued)
difference between conviction and acquittal at his criminal trial, given that Illinois allows an arrestee to use physical force in self-defense against a police officer's use of excessive force. And a jury's answer to the same question could just as easily be the difference between a finding of liability or no liability in this civil action.

(a)  **In General.**  Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

> (1)  the statement has equivalent circumstantial guarantees of trustworthiness;

> (2)  it is offered as evidence of a material fact;

> (3)  it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

> (4)  admitting it will best serve the purposes of these rules and the interests of justice.

Both this Court and defendants anticipated that Volland would move to admit the testimony under Rule 807, with defendants preemptively arguing that Rule 807 did not apply before Volland had even addressed it.  But Volland opted not to argue for admission under that Rule, explaining in a footnote that he believed his testimony could not be admitted under Rule 807 because such testimony is "specifically covered" by Rule 804(b)(1) (see V. Resp. at 1 n.1[7]).

Volland's supposition is incorrect as a legal matter.   This circuit's decisional law is still that announced in United States v. Boulahanis, 677 F.2d 586, 588-89 (7th Cir.1982) and United States v. Guinan, 836 F.2d 350, 354-55 (7th Cir.1988), two cases that have never been overruled. As is true of all other Courts of Appeals that have considered the issue, the discussions in both

---

[7]  Volland's filing inadvertently cut off that first footnote, so that its meaning was incomprehensible.  This Court's law clerk communicated with counsel for Volland to request that she supply the Court and defendants' counsel with a corrected footnote.  Volland's counsel complied, and the corrected footnote reads in full:

> Defendants also argue that Volland's prior testimony is inadmissible as hearsay because it does not meet the requirements of Rule 807.  Plaintiff concedes that Volland's prior testimony cannot be admitted pursuant to the residual exception of Rule 807 because the statements are specifically covered by Rule 804.

Boulahanis and Guinan have explicitly applied a "near-miss" approach, holding that Rule 807 is applicable to hearsay of a type that a more specific rule also addresses, even if the particular hearsay evidence at issue does not quite meet the criteria for admission under the more specific rule.

In an effort to escape such "near-miss" treatment, defendants have pointed to a two-judge concurring opinion in United States v. Dent, 984 F.2d 1453, 1465-67 (7th Cir. 1993) that said the residual exception to the hearsay rule -- then placed in Rule 804(b)(5) and now transferred to Rule 807 -- applies only to hearsay testimony not "specifically covered" by one of the narrower exceptions.[8] But that statement was made in the context of considering a type of hearsay (testimony before a grand jury) that is totally at odds with Rule 804(b)(1)(B)'s limitation. So, as the concurring judges wrote in Dent, id. at 1465-66:

> Rule 804(b)(5) reads more naturally if we understand the introductory clause to mean that evidence of a kind specifically addressed ("covered") by one of the four other subsections must satisfy the conditions laid down for its admission, and that other kinds of evidence not covered (because the drafters could not be exhaustive) are admissible if the evidence is approximately as reliable as evidence that would be admissible under the specific subsections.

---

[8] That concurrence is unusual because it was adopted by two of the three panel members (thus a panel majority) even though those two judges opted to label their opinion a concurrence. Whether such a concurrence can constitute binding precedent, though an interesting conceptual question, need not be addressed here. But it is noteworthy that even after Dent our Court of Appeals has continued to consider evidence simultaneously under both the residual exception and exceptions that more exactly "cover" the type of evidence at issue (see, e.g., United States v. Hall, 165 F.3d 1095, 1109-13 (7th Cir. 1999), which considered the admissibility of evidence both under the residual exception (then in Rule 803(24) and also since transferred to Rule 807) and under the statement-against-interest exception). And at least as importantly, no opinion of our Court of Appeals has either disavowed the Boulahanis-Guinan analysis or explicitly adopted the reasoning of the Dent concurrence in the 22 years since that opinion was published.

By contrast, as has just been shown, here Volland's prior testimony not only constitutes "evidence of a kind specifically addressed ('covered') by one of the four other subsections" but also <u>does</u> "satisfy the conditions laid down for its admission" under the applicable subsection (specifically, under Rule 804(b)(1)). So, despite Volland's concession and defendants' flawed reading of <u>Dent</u>, there is nothing in the <u>Dent</u> concurrence that would prevent this Court from considering the admissibility of Volland's prior testimony under Rule 807.[9]

Still, because Volland did not argue for admissibility under Rule 807, he did not set out facts sufficient to show that the Rule applies. More specifically, Volland did not show that his prior testimony "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts" (Rule 807(a)(3)). While it may well be true that Volland's prior testimony meets that criterion, at this point there is nothing in the parties' submissions to the Court that would support a finding that no equally probative evidence is reasonably available to Volland. And of course Volland, as the proponent of the evidence at issue, has the burden to show that the proffered testimony is properly admissible (see, e.g., <u>Lewis v. CITGO Petroleum Corp.</u>, 561 F.3d 698, 706 (7th Cir. 2009)). At this point, then, this Court cannot say definitively whether or not Volland's trial testimony would be admissible under Rule 807.

## <u>Conclusion</u>

For the foregoing reasons, plaintiff's motion to admit Volland's testimony from the prior criminal trial (Dkt. 83) is granted, while defendants' motion to bar that testimony (Dkt. 84) is

---

[9] That is especially so here, given that defendants have been already heard on their objections to admission of Volland's trial testimony under the residual exception (see D. Motion at 11-13).

denied.  All parties' counsel are ordered to appear for a status conference at 9:15 a.m. on

March 6, 2015.

_____
Milton I. Shadur
Senior United States District Judge

Date:  February 27, 2015